UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRISTAN TANNER,

     Plaintiff,

v.                              Case No. 8:21-cv-2293-VMC-TGW

STRYKER CORPORATION
OF MICHIGAN,

     Defendant.
_____/

**ORDER**

     This matter is before the Court on consideration of Defendant Stryker Corporation of Michigan's Motion for Summary Judgment (Doc. # 33), filed on August 18, 2022. Plaintiff Tristan Tanner responded on September 22, 2022. (Doc. # 37). Stryker filed a reply on October 20, 2022. (Doc. # 40). For the reasons that follow, the Motion is granted.

**I.**   **Background**

     **A.**   **Mr. Tanner's Employment**

     Stryker is a medical technology company that offers products "designed to improve patient and hospital outcomes." (Doc. # 33-1 at 1).

     Mr. Tanner began working for Stryker in November 2020, when Stryker acquired Wright Medical, where he worked as a Hub Material Handler II in Tampa. (Doc. # 34-1 at 17:10-16,

18:11-19:6). As a Material Handler, Mr. Tanner was responsible for "delivering surgical equipment to hospitals and surgical centers, retrieving and inspecting equipment after use, tracking inventory and placing orders." (Id. at 18:11-19:6, 60:6-62:10).

Mr. Tanner's supervisor was Timothy Eckroad, Field Operations Manager. (Id. at 24:3-5). Laura-Ann Egidio was Mr. Tanner's "HR Business Partner." (Doc. # 33-1 at 2).

### B. Stryker's Leave Policy

With respect to its attendance policy, Stryker sorts its employees into three categories: (1) non-exempt employees with set shifts, (2) customer-facing, non-exempt employees or non-exempt without set shifts, and (3) exempt employees. (Id. at 1-2). Employees with set shifts are those whose shifts "have a definitive starting and ending time[.]" (Doc. # 34-1 at 74:15-75:1).

Under the attendance policy, non-exempt employees with set shifts accrue "occurrence points" for violating the policy. (Doc. # 34-1 at 43-44). A non-exempt employee with set shifts who is "absent from work without an available sick day receives two occurrence points." (Id. at 43; Doc. # 33-1 at 2). A non-exempt employee with set shifts who incurs five occurrence points in a twelve-month period is subject to

termination. (Doc. # 33-1 at 2). Mr. Tanner indicated that he was familiar with this policy. (Doc. # 34-1 at 74:15-75:1, 106:16-21).

According to Stryker's policy, the accrual of occurrence points "will generally result in" a verbal warning for one point, a first written warning for two points, a second written warning for four points, and termination for five points. (Doc. # 34-1 at 43-44). As Mr. Tanner's immediate supervisor, Mr. Eckroad was responsible for giving him the appropriate warnings under Stryker's attendance policy. (Doc. # 34-2 at 46:20-21). Ms. Egidio was responsible for deciding whether to terminate Mr. Tanner for a violation of the attendance policy. (Doc. # 33-1 at 2).

Ms. Egidio believed Mr. Tanner was a non-exempt employee with set shifts. (Doc. # 33-1 at 3). She stated that Stryker's drivers had set shifts, and that Mr. Tanner, as a driver, was a non-exempt employee. (Doc. # 34-2 at 35:10-37:5). Mr. Eckroad stated that he believed Mr. Tanner's work was "customer-facing." (Doc. 34-3 at 20:13-14, 57:18-21). Mr. Eckroad also indicated that he thought Mr. Tanner was "an employee for which there was a policy under which he accumulated points[.]" (Id. at 54:18-19). Mr. Eckroad asked Mr. Tanner to reach out to Ms. Egidio when Mr. Tanner stated

that he had exhausted his personal time off and sick leave because "HR controls employee situations such as these." (Id. at 46:22).

Stryker also has a Family and Medical Leave Act policy, under which it provides leave to eligible employees for the birth of a child. (Doc. # 33-3 at 1-2). The FMLA policy provides employees with twelve weeks of unpaid leave following the birth of their child. (Doc. # 34-1 at 38). Under the policy, "a father's FMLA leave for the birth of his child begins on the day of his child's birth." (Id. at 2). If a father is absent from work prior to the birth of his child, then Stryker requires the father to "use his [personal time off]/sick days to cover these absences." (Id.).

Finally, Stryker has a parental leave policy. (Doc. # 33-3 at 2). Under the parental leave policy, an employee's leave for the birth of his child begins when "their child is born and once the employee submits documentary proof of [his] child's birth[.]" (Id.). Under the parental leave policy, an employee is entitled to six weeks of paid leave. (Id.).

Stryker's attendance, FMLA leave, and parental leave policies are outlined in its employee handbook. (Id. at 1-2). Mr. Tanner received a copy of the handbook upon becoming a Stryker employee. (Doc. # 34-1 at 74:15-76:3). He also

received "training on Stryker's various policies," including the attendance policy. (<u>Id.</u> at 74:15-75:1).

### C.   **Mr. Tanner's Request for Leave**

Mr. Tanner learned that his girlfriend, Amanda Shelburn, was pregnant with his child on December 12, 2020. (Doc. # 33-2 at 1). He informed Stryker that he expected that his daughter would be born in the first week of August 2021. (Doc. # 34-1 at 65:3-66:8). On June 21, 2021, Mr. Tanner told Stryker's myHR Leaves team, a specialist HR group, that his girlfriend was pregnant and asked whether he qualified for paternity leave. (<u>Id.</u>).

Courtney Linn, an HR Leaves Specialist, was in charge of Mr. Tanner's leave request. (<u>Id.</u> at 66:9-14). He and Ms. Linn discussed his leave request on June 22, 2021. (<u>Id.</u> at 68:17-69:5). On June 25, 2021, Ms. Linn told Mr. Tanner that he was eligible for both parental and FMLA leave for the birth of his child. (<u>Id.</u> at 69:6-23, 94:5-95:1). She also sent him a "Notice of Eligibility & Rights and Responsibilities under the FMLA and a request for leave form." (<u>Id.</u>). Mr. Tanner was required to complete and return the request for leave form by July 1, 2021. (<u>Id.</u> at 94:5-95:1).

On July 5, 2021, Mr. Tanner emailed Ms. Linn and Mr. Eckroad, writing that July 26, 2021, was the "'anticipated'

start date for his leave." (Id. at 62:11-21). He stated that he believed his daughter would be born sometime during "the last week of July/first week of August" and that he would be traveling to Connecticut, where Ms. Shelburn lived, for the birth. (Id.). On July 7, 2021, Mr. Tanner submitted his request for leave form. (Id. at 70:8-10, 97:14-23). He indicated on the form that his anticipated dates of leave were July 26, 2021, to October 6, 2021. (Id.).

Ms. Linn approved Mr. Tanner's request for FMLA and parental leave on July 8, 2021. (Doc. # 33-3 at 3). The "anticipated FMLA leave schedule" outlined in the designation notice Ms. Linn sent him began July 26, 2021, and ended October 17, 2021. (Id.). The notice also contained the following warning: "The FMLA requires that you notify us as soon as practicable if the dates of scheduled leave change, are extended, or were initially unknown." (Id.). Ms. Linn also reminded him on several occasions that his leave would not go into effect until his child was born. (Id.; Doc. # 34-4 at 46:6-24).

On July 8, 2021, Mr. Tanner told Ms. Linn that he would leave for Connecticut on July 27, 2021, and asked her how he would be paid in the event the child's birth was delayed. (Doc. # 34-1 at 70:20-71:9). Ms. Linn wrote that his FMLA

"benefits apply once the baby arrives" and that if he planned to take leave before the birth, then he was "required to just use a sick or vacation day." (Id. at 38). Mr. Tanner confirmed that he understood the details of his leave. (Id.). On July 16, 2021, Ms. Linn again reminded him that his leave would begin once his daughter was born. (Id.).

### D.   **Mr. Tanner's Absences Prior to the Birth**

Mr. Tanner was absent a half-day on July 14, 2021, to receive his COVID-19 vaccine. (Id. at 76:22-78:18). The following day, he used a sick day to cover his absence due to illness after receiving the vaccine. (Id. at 79:22-80:11).

On July 19, 2021, he emailed Ms. Egidio to tell her he would be leaving on "[July] 26th-27th and driving up to Connecticut" for his daughter's birth. (Id. at 72). He stated that "the paternity leave HR" told him to speak with Ms. Egidio to "arrange time off prior to the birth." (Id.). He also wrote that "the paternity leave HR" would only be "adding the time off from date of birth." (Id.).

On July 20, 2021, Ms. Shelburn told Mr. Tanner that their daughter was expected to be born on August 12, 2021. (Doc. # 33-2 at 2). Despite learning this information, on July 30, 2021, Mr. Tanner told Mr. Eckroad that he would be absent the week of August 2, 2021, "because his daughter was expected to

be born any day that week." (Doc. # 34-1 at 76:22-77:6, 83:1-84:14). He told Mr. Eckroad that he would have to use his personal time off and sick days until the birth because "paternity leave only starts on the actual birth day." (Id. at 53). Mr. Tanner also acknowledged that he only had four personal time off days left. (Id.).

Mr. Tanner left for Connecticut on August 8, 2021; however, he was absent from work beginning on August 2, 2021, during which time he was "planning, packing, and preparing for the trip." (Id. at 83:20-84:11, 86:17-23, 102:23-104:1, 105:4-8). Mr. Tanner exhausted his personal time off on August 5, 2021. (Doc. # 33-1 at 2). Between August 9 and August 12, 2021, he exhausted his remaining sick leave. (Id.). He accrued occurrence points for absences on August 13, 16, 17, and 18, 2021, for which he did not have any available personal time off or sick leave. (Id. at 3). Mr. Tanner did not receive verbal or written warnings for accruing occurrence points. (Doc. # 34-2 at 46:11-47:13).

On August 16, 2021, he emailed Ms. Linn, explaining that he had exhausted his personal time off and sick days and asking what he should do until his daughter was born on August 18 and his parental and FMLA leave started. (Doc. # 34-1 at 62). Ms. Linn reiterated that his FMLA and parental leave

would begin once his daughter was born and that he needed to use his personal time off or sick leave until the birth. (Id.). On August 18, 2021, he emailed Ms. Egidio to ask if he could "go over the [personal time off] limit . . . to avoid penalties[.]" (Id. at 61). Ms. Egidio replied that if Mr. Tanner "d[id] not have time to cover [his] absence, [he would] accrue points[.]" (Id.). Mr. Tanner responded that he would "just take points then as nothing else I can do." (Id.). Mr. Tanner stated that "[HR] would have told [him] at that point that [he] had eight points." (Id. at 102:12-13). Stryker's HR system, Workday, recorded his absences. (Id. at 103:15-24).

Mr. Tanner's daughter was born on August 19, 2021. (Doc. # 33-2 at 2).

### E.   Mr. Tanner's Termination

By August 18, 2021, Mr. Tanner had accrued eight occurrence points; three more than the five points that could result in termination under Stryker's attendance policy. (Doc. # 33-1 at 3). On August 18, Ms. Egidio decided to terminate Mr. Tanner's employment due to his unexcused absences on August 13, 16, 17, and 18, 2021. (Id.). Mr. Eckroad texted Mr. Tanner on August 19, 2021, to tell him he had accrued eight occurrence points and to ask if he was available for a phone call. (Doc. # 34-1 at 100:3-12, 109:1-

9

110:5). During a phone call on August 20, 2021, Ms. Egidio and Mr. Eckroad informed Mr. Tanner that his employment was terminated due to his unexcused absences. (Doc. # 33-1 at 3; Doc. # 34-1 at 108:24-25).

**F.   Procedural History**

Mr. Tanner initiated this action on September 28, 2021, asserting claims for: interference with FMLA rights (Count 1) and retaliation in violation of the FMLA (Count 2). (Doc. # 1). Stryker filed its answer on November 4, 2021, (Doc. # 14), and the case proceeded through discovery.

Now, Stryker seeks summary judgment on both counts. (Doc. # 33). Mr. Tanner filed his response on September 22, 2022 (Doc. # 37), and Stryker replied on October 20, 2022. (Doc. # 40). The Motion is ripe for review.

**II.   Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344

F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III.  **Analysis**

    A.   **Interpretation of FMLA**

Mr. Tanner argues that the FMLA entitles an employee to take leave prior to the birth of his child to ensure the employee can actually be present for the birth. (Doc. # 37 at 8). He contends that "as a matter of statutory construction, and common sense, the FMLA right to leave must include some period of time before the day of the birth" or "parents would miss the birth and lose the very benefit that the FMLA provides." (Id.). Mr. Tanner also states that this case "turns on whether the FMLA prohibited Stryker from firing Tanner for those absences." (Id. at 7).

Stryker argues that the FMLA should not be interpreted to require an employer to grant leave to an employee prior to the day of a child's birth in all circumstances. (Doc. # 40 at 2). Instead, Stryker contends that Congress anticipated situations in which employees are entitled to FMLA leave prior to the birth and that Mr. Tanner did not fit into any of those situations. (Id. at 2-3).

The FMLA entitles an employee to leave (1) "for the birth of their child," and (2) "to be with the healthy newborn child (i.e., bonding time) during the 12-month period beginning on the date of birth." 29 U.S.C. § 825.120(a)(1)-(2). In 29 U.S.C. § 825.120(a)(4)-(5), Congress outlines two "[c]ircumstances [that] may require that FMLA leave begin before the actual date of birth of a child." 29 U.S.C. § 825.120(a)(4). First, an expectant mother may require leave for incapacity due to pregnancy or for prenatal care. Id. Second, "[a] spouse is entitled to FMLA leave if needed to care for a pregnant spouse who is incapacitated or if needed to care for her during her prenatal care[.]" 29 U.S.C. § 825.120(a)(5).

Mr. Tanner cannot point to any case in which a court adopted his preferred interpretation of the FMLA parental leave statute. The Court will not adopt his interpretation

13

and determines that Stryker asserts the correct interpretation. By outlining several situations in which employees are entitled to leave prior to the birth of a child, Congress excluded the possibility that the FMLA entitles employees to leave prior to the birth in other circumstances. See Dean v. United States, 556 U.S. 568, 574 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

In 29 U.S.C. § 825.120(a)(4)-(5), Congress outlines two situations in which an employee may be entitled to FMLA leave prior to the birth of a child. First, an expectant mother "may take FMLA leave before the birth of the child for prenatal care or if her condition makes her unable to work." 29 U.S.C. § 825.120(a)(4). Second, "a spouse is entitled to FMLA leave if needed to care for a pregnant spouse who is incapacitated or if needed to care for her during her prenatal care." 29 U.S.C. § 825.120(a)(5). Congress also provided leave prior to birth to employees who are adopting children. See 29 U.S.C. § 825.121(a)(1) ("Employees may take FMLA leave before the actual placement or adoption of a child if an absence from work is required for the placement for adoption

or foster care to proceed."). In fact, 29 U.S.C. § 825.121(a)(1) even specifies that leave for travel prior to adoption is appropriate when an employee needs to "travel to another country to complete an adoption." Id. This analysis confirms that Congress contemplated circumstances in which FMLA leave should begin before the birth of a child and that it purposely excluded the circumstance of an employee traveling to the location of his child's birth.

Mr. Tanner's case does not fit within any of the circumstances Congress considered worthy of FMLA leave prior to the birth of a child. The Court appreciates that Mr. Tanner faced a difficult situation in trying to predict when to begin his leave when Ms. Shelburn was set to give birth in Connecticut; however, he was not entitled to take FMLA leave prior to the birth. Therefore, Mr. Tanner's FMLA leave did not begin until August 19, 2021.

### B.   **FMLA Retaliation**

Mr. Tanner claims that he was terminated for taking protected FMLA leave, and, therefore, that he has direct evidence that Stryker retaliated against him for taking FMLA leave. (Doc. # 37 at 15). However, the Court has already determined that Mr. Tanner was not entitled to take FMLA leave

prior to the birth of his child. Mr. Tanner, therefore, does not have direct evidence of retaliation.

"Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, [courts] apply the burden shifting framework established by the Supreme Court in" McDonnell Douglas. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).

### 1. Prima Facie Case

"A plaintiff bringing an FMLA retaliation claim must show that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley v. Army Fleet Support, LLC, 54 F. Supp. 3d 1272, 1282 (M.D. Ala. 2014). "To state a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) the adverse action was causally related to a protected activity." Id. "If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." Id.

Courts construe the causation element "broadly" and "a plaintiff need only demonstrate 'that the protected activity

and the adverse action were not wholly unrelated.'" <u>Debe v.</u>
<u>State Farm Mut. Auto. Ins.</u>, 860 F. App'x 637, 639 (11th Cir.
2021) (citing <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d
1161, 1180 n.30 (11th Cir. 2003)). A plaintiff can establish
a causal connection by showing a close temporal proximity
between his employer's discovery of the protected activity
and the adverse action, but the temporal proximity must be
"very close." <u>Thomas v. Dejoy</u>, No. 5:19- cv-549-TKW-MJF, 2021
WL 4992892, at *10 (N.D. Fla. July 19, 2021).

Regarding the prima facie case, Stryker argues that Mr.
Tanner cannot establish causation for his termination. (Doc.
# 33 at 14). It contends that Mr. Tanner engaged in an
intervening act of misconduct – violating the attendance
policy – after he requested leave, thereby eliminating any
temporal inference between Mr. Tanner's request for leave and
his termination. (<u>Id.</u> at 14-15).

A reasonable jury could find that Mr. Tanner has
established that his termination was causally related to his
use of FMLA leave. Mr. Tanner was terminated on August 20,
2021, the day after he started his FMLA leave. The close
temporal proximity between when he began his leave and when
he was terminated is likely enough to establish causation in
this case. <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439

17

F.3d 1286, 1298 (11th Cir. 2006) ("Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." (internal quotation omitted)).

However, regardless of whether Mr. Tanner can establish causation, he cannot state a prima facie case of retaliation.

### 2. Non-Retaliatory Reason and Pretext

Even if Mr. Tanner could establish a prima facie case of retaliation based on his termination, Stryker has produced legitimate, non-discriminatory reasons for those actions and Mr. Tanner has not shown a genuine issue of material fact regarding pretext.

Mr. Tanner was terminated for violating the attendance policy when he was absent from work on August 13, 16, 17, 18, 2021, after he had exhausted his personal time off and sick leave. "The FMLA does not insulate an employee who has requested medical leave from being terminated for poor performance. So long as the employer would have taken the same action it did regardless of the request for leave, there is no statutory violation." Gamba v. City of Sunrise, 157 F. App'x 112, 113 (11th Cir. 2005). Under Stryker's attendance policy, Mr. Tanner's accrual of occurrence points was a valid

reason for termination. See Hayes v. Voestalpine Nortrak, Inc., 185 F. Supp. 3d 1314, 1322 (N.D. Ala. 2016) (citing Earl v. Mervyns, Inc., 207 F.3d 1361 (11th Cir. 2000)) ("[T]here is no FMLA violation where an employee is discharged after repeated infractions of a detailed attendance policy"). Stryker has shown that it terminated Mr. Tanner after repeated unexcused absences in violation of the attendance policy. Thus, Stryker has met its burden of producing a legitimate, non-discriminatory reason for its actions.

The burden now shifts to Mr. Tanner to show pretext. "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it 'head on and rebut it.'" Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). Thus, to show pretext, an employee must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons

19

for its action that a reasonable factfinder could find them unworthy of credence." McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)).

Mr. Tanner has not presented sufficient evidence of pretext. He has not rebutted that he was terminated for his unexcused absences on August 13, 16, 17, and 18, 2021. He argues that he was not subject to the attendance policy and that Stryker failed to follow its procedure for attendance policy violations. (Doc. # 37 at 19-21). He also argues that the temporal proximity between his use of FMLA leave and termination is sufficient to establish pretext. (Id. at 21).

First, Mr. Tanner argues that he was not an employee subject to the attendance policy. (Id. at 18). He argues, based on Mr. Eckroad's testimony, that he was a customer-facing employee who did not accrue points under the attendance policy. (Id. at 19; Doc. # 34-3 at 20:13-14, 57:18-21). He also states that Ms. Egidio has made inconsistent statements regarding whether she was the one who decided to terminate him. (Doc. # 37 at 21). He points to Ms. Egidio's deposition testimony, where she states that Mr. Eckroad was responsible for giving warnings to Mr. Tanner for his unexcused absences. (Doc. # 34-2 at 46:20-21). In her declaration, Ms. Egidio

states that she was responsible for deciding to terminate Mr. Tanner. (Doc. # 33-1 at 2).

Ms. Egidio's statements in her deposition and her declaration are not inconsistent. In her deposition, Ms. Egidio states that Mr. Eckroad was responsible for issuing warnings prior to termination. In her declaration, she states that she was responsible for making the final decision to terminate Mr. Tanner. Ms. Egidio's statements indicate that she and Mr. Eckroad played different roles in the enforcement process. They do not indicate that she has been inconsistent about whether she was responsible for deciding to terminate Mr. Tanner.

Ms. Egidio believed that Mr. Tanner was a non-exempt employee with set shifts subject to the attendance policy. (Id.). She stated that Stryker's drivers have set shifts and, therefore, are non-exempt employees. (Doc. # 34-2 at 35:10-37:5). According to Ms. Egidio, the decision to terminate Mr. Tanner was because of his unexcused absences. (Id. at 3). Mr. Eckroad, on the other hand, stated that he believed Mr. Tanner's work was "customer-facing." (Doc. 34-3 at 20:13-14, 57:18-21). He did not make this statement in the context of discussing whether Mr. Tanner was subject to the attendance policy. In fact, Mr. Eckroad indicated that he thought Mr.

Tanner was "an employee for which there was a policy under which he accumulated points[.]" (Id. at 54:18-19).

Mr. Tanner does not present any facts that call into question Ms. Egidio's good faith belief. Even assuming Ms. Egidio was mistaken about whether Mr. Tanner was subject to the attendance policy, her mistake does not constitute evidence of pretext. See Hudson v. Blue Cross Blue Shield of Ala., 431 F. App'x 868, 869 (11th Cir. 2011) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." (citation omitted)); Hayes v. Deluxe Mfg. Operations LLC, No. 16-cv-2056, 2018 WL 1461690, at *20 (N.D. Ga. Jan. 9, 2018) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.").

Second, Mr. Tanner argues that Stryker failed to follow the attendance policy. (Doc. # 37 at 20). He argues that Stryker did not follow its own attendance policy when it failed to give him verbal or written warnings when he accrued occurrence points, and he argues this is evidence that Stryker's given reason for terminating him was pretextual. (Id.).

The deviation from the attendance policy is not sufficient evidence of pretext. While Stryker did not give Mr. Tanner the exact warnings laid out in the attendance policy, he did receive actual notice that he was accruing points. Ms. Egidio told Mr. Tanner that he would "accrue points" if he was absent after he exhausted his personal time off and sick leave. (Doc. # 34-1 at 61). Mr. Tanner could also see that he was accruing absences through Workday, a common HR system software. (Id. at 103:15-24). Finally, Stryker's attendance policy states that the "[a]ccumulation of occurrence points within a rolling 12-month period will *generally* result in the following disciplinary actions . . ." (Id. at 43) (emphasis added). The policy indicates that the warnings are discretionary. As such, Stryker's failure to give the warnings is not evidence of pretext. See Ritchie v. Indus. Steel, Inc., 426 F. App'x 867, 873 (11th Cir. 2011) ("Nevertheless, if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext.").

Finally, Mr. Tanner argues that the "extremely close temporal proximity" between his FMLA usage and his termination is evidence of pretext. (Doc. # 37 at 19). He cites Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364

(11th Cir. 2007), in support of his argument. (Id.) Cooper Lighting, however, indicates that temporal proximity is relevant for the purpose of establishing causation – not pretext. See Id. ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."). Temporal proximity alone is insufficient evidence of pretext. See Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1138 (11th Cir. 2020) ("While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient.").

In short, despite his arguments on this issue (Doc. # 37 at 19-21), Mr. Tanner has not rebutted Stryker's legitimate, non-discriminatory reason for terminating him.

While Mr. Tanner is clearly dissatisfied with Stryker's treatment of him, it is not the Court's place to question the wisdom of an employer's decision. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). The Court merely reviews

whether an employer's decision was motivated by retaliation. Here, Mr. Tanner has not created a genuine issue of material fact as to that question.

Summary judgment is therefore granted to Stryker on Mr. Tanner's FMLA retaliation claim, Count 2.

### C.   **FMLA Interference**

As for Count 1, "[t]o establish an FMLA interference claim an employee must demonstrate by a preponderance of the evidence that he was denied a benefit to which he was entitled." Bradley v. Army Fleet Support, LLC, 54 F. Supp. 3d 1272, 1277 (M.D. Ala. 2014) (citing Pereda v. Brookdale Senior Living Communities, 666 F.3d 1269, 1274 (11th Cir. 2012)). "In addition to showing interference, a plaintiff must show that she has been prejudiced by the FMLA violation in some way." Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 592 (11th Cir. 2017).

Stryker was required to give Mr. Tanner notice of his eligibility to take FMLA leave within five business days of his request for leave. 29 C.F.R. § 825.300(b)(1). Mr. Tanner received the paperwork necessary to process his request for FMLA leave four days after he first gave Stryker notice of his need for leave (Doc. # 34-1 at 65:3-66:8, 69:6-23, 94:5-95:1). Stryker approved his leave request one day after he

submitted the necessary request for leave form. (Id. at 70:8-15, 97:14-23). Therefore, there is no claim that Stryker interfered with Mr. Tanner's request for leave.

The Court assumes without deciding, for the reasons discussed in the previous section, that Mr. Tanner can establish an FMLA interference claim due to the close temporal proximity between the beginning of his FMLA leave and his termination. However, Stryker is not liable because it established its affirmative "same decision" defense.

Plaintiff's request for or use of FMLA leave did not insulate him from termination for reasons unrelated to his FMLA activity. See Batson v. Salvation Army, 897 F.3d 1320, 1331 (11th Cir. 2018) ("It is well settled that where, as here, an interference claim 'is based on an employee's termination, . . . an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of [his] request for or use of FMLA leave.'"). Ms. Egidio decided to terminate Mr. Tanner for accruing eight occurrence points. The company's handbook clearly stated the attendance policy. (Doc. # 34-1 at 43-44). Employees received training on the policy, and Mr. Tanner was aware of the point system. (Id. at 74:15-75:1). Stryker kept track of absences and employees could view them

26

in Workday (Id. at 103:15-24), indicating that Stryker had a uniform policy regarding unexcused absences. Therefore, Stryker could have terminated Mr. Tanner for accruing eight occurrence points due to repeated unexcused absences, regardless of whether he was about to begin FMLA leave.

Summary judgment is therefore granted to Stryker on Mr. Tanner's FMLA interference claim, Count 1.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Stryker Corporation of Michigan's Motion for Summary Judgment (Doc. # 33) is **GRANTED.**

(2)   The Clerk is directed to enter judgment in favor of Defendant Stryker Corporation of Michigan and against Plaintiff Tristan Tanner on both counts of the complaint.

(3)   Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 30th day of November, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE